# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTHONY LLOYD, | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. JKB-16-2160 |
| GARRETT GLENNON *et al.*, | * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM

Anthony Lloyd, a self-represented Maryland prisoner, filed a civil rights complaint alleging that he was illegally detained in a State correctional facility when he injured his right triceps after falling from his bunk. He alleges he received constitutionally inadequate medical care for his injury. ECF 6. Now pending is a Motion to Dismiss or, in the Alternative, for Summary Judgment filed by defendants Contah Nimely, Lori Slavick, and Wexford Health Source, Inc. ECF 45, 47.[1] Plaintiff has responded (ECF 53, 55)[2] and defendants have replied (ECF 54). Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, defendants' dispositive motion will be GRANTED.[3]

### I. Factual Background

The plaintiff's claims have been previously summarized as follows:

---

[1] Defendants' motion for extension of time (ECF 44) is granted nunc pro tunc.

[2] Plaintiff has filed a "Motion to Dismiss" (ECF 53) and "Motion to Dismiss and Show Cause Wexford Trying to Dope the Court" (ECF 55). The motions shall be denied. They are in reality oppositions to defendants' dispositive motions and are construed as such.

[3] Plaintiff's claims against Warden J. Philip Morgan and Deputy State's Attorney for Baltimore County Garrett Glennon were previously dismissed. ECF 41 & 42.

Plaintiff indicates that in 2009 he was convicted of bank robbery and related offenses in the Circuit Court for Baltimore County. He was sentenced to 25 years' incarceration without the possibility of parole. On February 23, 2015, his petition for post-conviction relief was granted and his conviction vacated. ECF 1, p. 7.

On May 21, 2015, three months after he was granted post-conviction relief, he alleges he improperly remained confined in state prison at the Maryland Correctional Training Center ("MCTC"). *Id*. He states that his post-conviction counsel contacted Deputy State's Attorney Glennon requesting that he be transferred to the County Detention Center. *Id*., p. 8. Plaintiff indicates his belief that since he was then awaiting trial it was improper to continue to house him in the Division of Correction. *Id*.

While housed at MCTC, he fell from his bunk sustaining a serious injury to his right elbow. *Id*. Plaintiff states that he was "falsely diagnosed with a bone spur: and later taken to a local hospital where he was diagnosed with a torn tricep [*sic*] and blood clot." ECF 6, p. 3. He states that it took five months to have his injury treated and he underwent two surgeries to repair his arm. The first was performed on March 1, 2016, at Bon Secours hospital. ECF 1, p. 8. Plaintiff states his surgery was "botched." *Id*. Plaintiff indicates he was denied proper post-operative medical care by the named medical defendants who failed to follow the discharge instructions of his surgeon. *Id*., p. 8. Rather, Physician Assistant Lori Slavick removed the stitches. ECF 6, p. 3. The removal of the stitches/staples left a hole in his right elbow. He claims that as a result he has suffered excruciating pain, draining, infection, and burning from the ulcer that developed at the surgical site. ECF 1, pp. 8-9. He claims he was tortured by the physical therapist[4] and received second degree burns on his biceps. ECF 6, p. 3. He also claims he was burned by Dr. Saleem Muhammed. *Id*.

****

Also pending is plaintiff's "Supplement to Amended Complaint." ECF 39.[5] Plaintiff indicates that on June 29, 2017, he was returned to Bon Secours Hospital for additional surgery to treat his elbow injury. He states that once again his post-operative orders were not followed and that Contah Nimely continued to provide follow up care, despite the conflict of interest that exists due to plaintiff's suing Nimely in this case. Additionally, plaintiff alleges that he was directed to

---

[4] Plaintiff does not name the physical therapist in his complaint. Counsel for Wexford indicates that physical therapists are not employed by Wexford and the dispositive motion is not filed on behalf of the unnamed physical therapist. ECF 45-3 at p. 2, FN 1 (Memorandum).

[5] Over defendants' objection, plaintiff was permitted to amend the complaint to assert these additional allegations. ECF 41 & 42. The medical defendants' previously filed dispositive motion was denied without prejudice, subject to renewal, in order to provide them an opportunity to respond to the additional allegations. *Id*.

return to the surgeon two weeks after his surgery but was not returned. Instead, staff at the prison removed his stitches. Plaintiff maintains that this is the same type of conduct that caused him injury after his initial surgery to repair his elbow. He further maintains that his follow-up treatment with the surgeon was scheduled for August, weeks after the surgeon directed he return for follow-up care. *Id*.

ECF 41 at pp. 2-4.

**B.     Medical Defendants' Response**

In support of their motion, defendants have submitted various exhibits, including the affidavit of Robustiano Barrera, M.D. (ECF 27-5), and 139 pages of plaintiff's medical records relative to the initial injury and first surgery (ECF 27-4), as well as Contah Nimely, M.D.'s affidavit (ECF 47)[6] and an additional 184 pages of plaintiff's medical records detailing his care after the initial operation and including his second surgery and post-operative care. ECF 45-4.

Barrera avers that plaintiff has a medical history significant for hyperlipidemia, asthma, olecranon bursitis, and a torn right triceps tendon. ECF 27-5, ¶ 4. Barrera indicates that "[t]he olecranon bursa is a small fluid filled sac that decreases friction between tissues and bony structures in the elbow." *Id*., ¶ 5. It is described as very thin and when struck or injured can fill with fluid or blood and become enlarged and painful. *Id*. If the bursa is repeatedly irritated or injured, its walls may thicken and develop irregular areas of scar tissue that are often mistaken for bone chips or spurs. *Id*. Barrera avers that calcium may collect inside the bursa. *Id*. Olecranon bursitis may be treated with rest, application of ice, compression, elevation, or aspiration by a doctor. *Id*.

---

[6] Nimely's declaration was initially filed unsigned. ECF 45-5. Counsel subsequently filed a signed declaration by Nimely (ECF 47) that is materially different from the initial filing. As such, the unsigned declaration, ECF 45-5 shall not be considered. Plaintiff indicates he did subsequently receive a signed copy of ECF 47. ECF 55 at p. 1; ECF 55-1.

3

In August of 2015, due to complaints of pain and swelling, plaintiff's right olecranon bursa was aspirated. ECF 27-5, ¶ 6; ECF 27-4 at p. 1. The aspirated fluid was cultured and the culture was negative. *Id.*

Thereafter, plaintiff continued to complain of pain in his right elbow. ECF 27-5, ¶ 7; ECF 27-4 at p. 1. On October 27, 2015, he was evaluated by Physician's Assistant Murray who assessed plaintiff as having a palpable bone spur on the olecranon process that caused irritation to his skin. *Id.* Plaintiff reported pain when he flexed or extended his elbow. *Id.* An x-ray was ordered but did not show a spur. *Id.* Murray consulted with MCTC medical director Dr. Ottey who agreed to refer plaintiff to the onsite orthopedic doctor, Dr. Manning. Additional lab work and x-rays were also ordered. ECF 27-5, ¶ 7; ECF 27-4 at pp. 3-4. Barrera avers that "[a]lthough the x-ray tended to rule out a bone spur, the x-ray was [not] definitive of a diagnosis." ECF 27-5, ¶ 7. Barrera further avers the course of treatment provided plaintiff at this point was not contraindicated whether or not plaintiff suffered from a bone spur, and that plaintiff did not suffer any medical consequences due to the bone spur diagnosis. *Id.*

Plaintiff continued to complain of pain and swelling in his elbow. ECF 27-5, ¶ 8; ECF 27-4 at pp. 5-12. He was seen by nurses and mid-level providers to whom he expressed regular concern regarding the swelling in his elbow and reported that he was told it could be a sign of a blood clot. *Id.* Plaintiff was provided analgesic pain medication and educated about his condition. ECF 27-4 at pp. 5-12. Barrera avers that injury to the olecranon bursa commonly results in swelling and was likely the cause of the swelling. ECF 27-5, ¶ 8. He notes that plaintiff was never diagnosed as suffering from a blood clot. *Id.*

On November 17, 2015, plaintiff injured his right upper arm getting out of bed. ECF 27-5, ¶ 9; ECF 27-5 at p. 13. He was seen on November 23, 2015, by P.A. Murray who described

plaintiff as "report[ing] to the dispensary with color change, increasing pain, warmth, worsening swelling, and fluid moving up the arm." *Id*. Dark blue bruising from below the elbow to 14 centimeters up the posterior biceps was observed. Plaintiff's upper arm and elbow were described as extremely tender to the touch and warm. *Id*. It was noted that plaintiff's recent x-ray of the elbow showed no fracture, dislocation, or subluxation and the alignment was anatomic and that he had been referred to the onsite orthopedist but had not yet been seen. ECF 27-4 at p. 13. Murray consulted with the Regional Medical Director about the possibility of a septic joint. ECF 27-5, ¶ 9; ECF 27-5 at p. 13. The Regional Medical Director advised Murray to consult with Dr. Atanfu about sending plaintiff to Meritus Medical Center ("MMC") or Bon Secours Hospital for further evaluation. *Id*.

That same day, plaintiff was sent to MMC and underwent a CAT scan, which revealed "diffusely edematous triceps tendon with associated joint effusion and olecranon bursitis." ECF 27-5, ¶ 9; ECF 27-4 at p. 21. Plaintiff was diagnosed as suffering a right triceps tendon tear. He was directed to consult with an orthopedist for possible surgery and to follow up with an MRI. *Id*. Barrera avers that in his opinion to a reasonable degree of medical probability this was the appropriate treatment for plaintiff's November 17, 2015 injury. *Id*.

Plaintiff returned to MCTC that day. ECF 27-5, ¶ 9; ECF 27-4 at p. 28. The recommendation for an MRI was noted. His prescription for a tapering dose of prednisone was continued and a consult to see Dr. Manning submitted. ECF 27-5, ¶ 10; ECF 27-4 at pp. 28-29. Plaintiff saw Dr. Manning on December 4, 2015. ECF 27-5, ¶ 10; ECF 27-4 at p. 30. His right elbow range of motion was described as full. *Id*. "[A] large area of echymosis about the medial distal half of the right arm" was noted. Minimal swelling of the elbow was also observed and a palpable defect above the right olecranon noted. An x-ray of undisclosed date showed a "tiny

5

olecranon spur." ECF 27-4 at p. 30. Plaintiff was provided a sling and an elbow sleeve and it was recommended that he be provided an urgent consult with an outside orthopedic doctor for surgical repair of the right triceps. *Id*. at pp. 30-32.

Plaintiff was seen by Dr. Krishnaswamy on December 15, 2015, who indicated that plaintiff needed reconstruction of the triceps and it would be done "soon." ECF 27-5, ¶ 11. On February 23, 2016, plaintiff underwent a preoperative examination in preparation for his triceps repair surgery (ECF 27-4 at p 34-35), which occurred at Bon Secours Hospital on March 1, 2016. ECF 27-5, ¶ 13; ECF 27-4 at pp. 36-43.

Plaintiff tolerated the procedure well and there were no complications. ECF 27-5, ¶ 13; ECF 27-4 at pp. 36-43. He returned to MCTC that day with a splint and a sling on his right arm. ECF 27-5, ¶ 13; ECF 27-4 at p. 44-45. It was noted that he could move all fingers on his right hand and his sensation was intact. His surgeon prescribed Cephalexin and Hydrocodone-acetaminophen. *Id*. He was cleared to return to his housing unit. *Id*. Barrera avers that in his opinion to a reasonable degree of medical probability this was the appropriate treatment for plaintiff's right tendon tear. ECF 27-5, ¶ 13.

On March 23, 2016, Lori Slavick, P.A. removed plaintiff's staples during an unscheduled provider visit. ECF 27-5, ¶ 14; ECF 27-4 at p. 48-49. The staples were removed without incident and the area cleaned and an Ace wrap placed. Slavick noted that plaintiff was to follow up with Krishnaswamy as soon as possible. ECF 27-4 at p. 48. Barrera avers that, as a mid-level provider, Slavick was competent to remove the staples and was within her authority and medical judgment to decide to do so. ECF 27-5, ¶ 14. He further avers that there is no indication that removing the staples at the facility caused plaintiff any adverse reaction or condition. *Id*.

The following day, Amber Knoll, L.P.N., while cleaning plaintiff's wound, noted additional sutures were still in the wound. ECF 27-4 at p. 50. Plaintiff advised Knoll that the staples had been removed the previous day and he was unaware that there were sutures as well. *Id*. Knoll removed the sutures and cleaned and dressed the area. *Id*. She educated plaintiff regarding the importance of keeping the wound clean and as to the signs and symptoms of infection. *Id*. Barrera avers that removing the sutures was within Knoll's competency and authority. ECF 27-5, ¶ 15. He further avers that there is no indication that removal of the sutures by Knoll caused plaintiff any adverse condition or reaction. *Id*.

Plaintiff continued to be seen by medical staff and to receive regular wound care. ECF 27-4 at pp. 51-54.

Dr. Krishnaswamy evaluated plaintiff on April 15, 2016. ECF 27-5, ¶16; ECF 27-4 at pp. 55-62. The wound was described as healed, although Krishnaswamy noted that a small area required further daily dressing changes for 1-2 weeks. ECF 27-5, ¶16; ECF 27-4 at p. 55. Plaintiff was instructed to only lift light weights for another 4-6 weeks and physical therapy was recommended. *Id*. Physical therapy was approved on May 13, 2016. ECF 27-5, ¶ 18; ECF 27-4 at p. 76.

On April 28, 2016, plaintiff reported yellow drainage from his wound. ECF 27-4 at p. 64. On May 3, 2016, Slavick noted symptoms of infection and started plaintiff on Bactrim Ds. ECF 27-5, ¶ 17; ECF 27-4 at p. 66. Plaintiff was examined by Maksed Choudry, M.D., the following day, who diagnosed plaintiff as having an infected and draining ulcer in the region of the right olecranon bursa. ECF 27-5, ¶ 17; ECF 27-4 at p. 67. Purulent materials were observed on plaintiff's dressings and a quarter inch round and deep non-healing ulcer was observed. *Id*. Choudry ordered a "wound C&S," an arm sling, and follow up with Dr. Saleem in the onsite

surgery clinic. *Id*. Choudry prescribed plaintiff Glucosamine Chondroitin and Tylenol Extra Strength Arthritis, in addition to the Bactrim previously prescribed. ECF 27-5, ¶ 17; ECF 27-4 at p. 68. Plaintiff continued to be seen by medical staff who evaluated and treated his wound. ECF 27-4 at pp. 72-75, pp. 133-34.

Plaintiff's referral to Dr. Saleem was approved by Dolph Druckman, M.D., on May 27, 2016, and plaintiff was examined by Dr. Saleem on May 31, 2016. ECF 27-5, ¶ 19; ECF 27-4 at pp. 77-79. Saleem diagnosed plaintiff as suffering from an open wound that was "necrorin" and pink without drainage. ECF 27-5, ¶ 19; ECF 27-4 at pp. 78. The wound measured approximately 2.5 centimeters and 2.0 centimeters from the olecranon bursa and was approximately 1.5 centimeters deep. The area was covered with small dead skin, which was debrided. Silvadene and a clean gauze dressing were directed to be applied every other day. *Id*.

Over the next three months, plaintiff was regularly seen by Dr. Saleem and by nursing staff for wound debridement, cleaning, and dressing changes. ECF 27-5, ¶ 20; ECF 27-4 at pp. 80-103, 131-32. Plaintiff's wound was initially described as healing well, and it was noted on June 21, 2016, that the wound was "almost closed [with] only 0 cm round [] left" and on July 5, 2016, that the "wound [was] almost closed with only a spot left." ECF 27-4 at pp. 87, 91. However, on July 19, 2016, a 2 millimeter circle about 3 millimeters deep was noted. ECF 27-4 at p. 98. On August 2, 2016, it was noted that the "pinpoint wound" was draining clear fluid. ECF 24-4 at p. 100.

On August 16, 2016, the opening, described as a 2 millimeter circular surface opening, approximately 1.5 centimeters deep, continued to drain pus. ECF 24-4 at p. 104. The wound was packed with silver nitrate and the frequency of plaintiff's follow-up visits was increased. *Id*.; ECF 27-5, ¶ 20.

Plaintiff was seen regularly by medical staff throughout August and September. ECF 27-4 at pp. 106-117, 131-32. The wound was described as healing and improving slowly. *Id.*; *see also* ECF 27-5, ¶ 20. During this time, plaintiff was provided analgesic pain medication and antibiotics. ECF 27-4 at pp. 106-116. The wound was regularly debrided and the dressing changed. *Id.* Additional x-rays of the elbow were taken and were unremarkable. *Id.*, p. 114.

On September 20, 2016, Saleem referred plaintiff for consultation with Dr. Manning, the onsite orthopedist. ECF 27-4 at p. 115. Plaintiff was scheduled to see Dr. Manning on October 7, 2016, and November 4, 2016, but plaintiff was offsite at court, and his appointments were rescheduled. *Id.*, at pp. 118-19.

In December of 2016,[7] plaintiff's wound was described as pink and healing well with no sign of infection or drainage. ECF 27-4 at pp. 120, 123, 125. Dr. Manning evaluated plaintiff on January 6, 2017. ECF 27-4 at p. 137. The doctor considered surgical exploration and incision and drainage of the wound at an outside hospital. ECF 27-4 at p. 137. New x-rays were ordered but showed no acute disease. *Id.*; ECF 45-4 at p. 6. Barrera avers that, in his opinion to a reasonable degree of medical probability, the course of treatment for plaintiff's right elbow wound infection was appropriate. ECF 27-5, ¶ 20. Plaintiff was provided regular wound care throughout January and February of 2017. ECF 45-4 at pp. 94-97.

---

[7] It appears that plaintiff was transferred from MCTC to Jessup Correctional Institution in October and was held there until December 19, 2016, when he returned to MCTC. *See* ECF 27-4 at p. 123. On December 22, 2016, he advised medical staff that wound care had not been completed since he arrived back at MCTC on December 19, 2016, but that he had dressing supplies in his cell and he had just run out of them on that date. *Id.* No drainage or signs of infection were noted. *Id.*

Plaintiff has provided the Warden's response to an administrative grievance filed by him regarding his health care, and it indicates that on May 4, 2016, the physician requested a culture be obtained but the request was not placed in the correct template and nursing was not made aware of the order. Plaintiff was nevertheless prescribed antibiotics and seen regularly for wound care. He was scheduled to see Dr. Manning, the onsite specialist, on October 20, 2016; however, plaintiff was taken offsite for court on September 30, 2016, and did not return to MCTC until December 19, 2016. Once returned, the wound care was resumed and he was rescheduled to see Dr. Manning. Dr. Manning noted, on January 7, 2016, that the wound had been cultured on November 3, 2016, and antibiotics were provided. ECF 53-4 at p. 1.

9

A January 7, 2017, culture revealed a Staph Aureous bacterium infection in plaintiff's elbow for which plaintiff was prescribed Dicloxacillin, with a follow up course of Bactrim. *Id*.; ECF 45-4 at pp. 21, 26.

Plaintiff was seen by Dr. Akal on February 9, 2017, and diagnosed as suffering from a chronic weeping sinus tract on the right elbow that would likely not heal without removal. ECF 45-5, ¶ 5; ECF 45-4 at p. 7. Dr. Akal submitted a request for a surgical consultation. *Id*. The on-site surgeon recommended a CT scan of the right elbow prior to plaintiff's being seen by an off-site surgeon. ECF 47, ¶ 5; ECF 45-4 at pp. 13-14. The CT scan was completed on March 28, 2017, and showed "nonspecific soft tissue swelling overlying the olecranon." ECF 47, ¶ 5; ECF 45-4 at p. 17. Plaintiff received regular wound care throughout March and April of 2017. ECF 45-4 at p. 91-94.

Plaintiff was seen in a telemed conference by Dr. Krishnaswamy on May 2, 2017. ECF 47, ¶ 5; ECF 45-4 at p. 22. Dr. Krishnaswamy recommended surgical removal of the wires/screws from the prior surgical repair[8] and that a repeat culture and x-ray of the site be taken. *Id*. A new culture was taken (ECF 45-4 at pp. 26-27), and plaintiff was prescribed Dicloxacillin. *Id*. at p. 28. Plaintiff was regularly seen for wound care through May and June. *Id*. at pp. 89-91. The Dicloxacillin was ineffective and on June 13, 2017, plaintiff was admitted to the infirmary to receive a five day course of Vancomycin intravenously. *Id*. at pp. 28-29, 32-70. He was discharged from the infirmary on June 19, 2017. *Id*. at p. 68.

On June 27, 2017, plaintiff was seen by Dr. Choudry for his preoperative clearance. ECF 45-4 at p. 76. He was to undergo surgical removal of the wires in his elbow on June 29, 2017. *Id*. Surgical notes indicate that plaintiff tolerated the procedure well and that his right elbow was explored, irrigated, and necrotic tissue was debrided. *Id*. at p. 78-79.

---

[8] On June 5, 2017, Krishnaswamy indicated he could not perform the surgery earlier than 3-4 weeks. *Id*. at p. 28.

Contah Nimely, M.D., avers that plaintiff's discharge instructions from Bon Secours Hospital after his June 29, 2017, surgery recommended a short-term dose of hydrocodone-acetaminophen for pain medication. ECF 47, ¶ 4 (Nimely Decl). Nimely indicates that Tylenol #3 was substituted as pain medication, which Nimely avers is an acceptable substitute for hydrocodone-acetaminophen. *Id*.

Plaintiff was returned to MCTC where he was seen by medical staff for wound care. ECF 45-4 at p. 83-84, 89. He returned for follow up with Dr. Krishnaswamy on July 3, 2017, (*id*., at p. 85) and reported to MCTC medical staff that his elbow felt much better. *Id*. at p. 85. On July 13 and 16, 2017, plaintiff's sutures were removed. ECF 45-4 at pp. 106-107. Dr. Nimely avers that he determined the sutures needed to be removed and directed their removal. ECF 47 at ¶ 6. He avers that it is an appropriate exercise of his independent professional judgment to determine whether sutures should be removed and unnecessary to confirm with the surgeon when sutures should be removed. *Id*. Further, Nimely offers that it is appropriate and within the standard of care for a registered nurse or licensed practical nurse to remove sutures. *Id*. At the time the sutures were removed, it was noted that the wound continued to be open and draining. ECF 45-4 at p. 107.

At the time of plaintiff's discharge from the June 29, 2017, surgery, it was recommended that he follow up with the surgeon in two weeks. ECF 47, ¶ 7. An effort to schedule plaintiff's follow up was timely implemented; however, the process for obtaining an off-site visit involves a number of steps and a variety of individuals. *Id*. Non-emergency situations typically require 6-8 weeks to schedule an off-site visit. *Id*. Plaintiff's condition was not deemed urgent and the routine process was followed. *Id*. Nimely further indicates it was not medically necessary for plaintiff to be seen by his surgeon within the two-week period, as those instructions are typically

given at hospitals to patients who need to see their provider for follow up care. *Id*., ¶ 8. In the prison context, Nimely observes, inmates have access to providers through scheduled referrals and the sick call process. As such, inmates can receive timely monitoring of their condition by onsite medical staff as happened in plaintiff's case. *Id*.

Plaintiff was seen for follow-up by Dr. Krishnaswamy on August 16, 2017. ECF 45-4 at p. 111. At that time, it was noted that the wound was healing well. Dressing and Ace bandages were applied and it was directed that dressing changes continue on a daily basis. *Id*. Plaintiff was advised not to do any heavy weightlifting with his right arm for two months. *Id*. He was directed to follow up with the surgeon in four weeks for an unrelated knee issue. *Id*.

On September 12, 2017, a nursing note indicates that the right elbow wound "is closed, however, it feels like boggy fluid filled areas surround old wound." ECF 45-4 at p. 122. Plaintiff was seen by the nurse practitioner on September 15, 2017. *Id*. at p. 123. Despite the hardware having been removed in June, the wound remained open and plaintiff reported a burning sensation. *Id*. Plaintiff also reported that the elbow accumulated pus each time the wound closed, which resulted in the wound reopening. *Id*. It was noted that the wound was 1.5 centimeters x 3 centimeters by .5 centimeters and was draining fluid, which was again cultured. Plaintiff was started on the antibiotic Bactrim. *Id*. at pp. 123-124. It was later noted that plaintiff had developed a resistance to Bactrim and an order was placed for a different antibiotic. *Id*. at p. 125. On September 26, 2017, Dr. Tessema noted that plaintiff's right elbow soft tissue infection, which was being treated with Rifamin, showed signs of improvement. *Id*. at p. 126. Plaintiff was advised to complete the antibiotic and return for evaluation. *Id*.

Plaintiff was not seen for follow-up and submitted at least two sick call requests seeking follow-up with the physician. ECF 45-4 at pp. 129-30. He refused to be seen for scheduled nurse visits on November 23 and 26, 2017. ECF 45-4 at p. 132-33.

On November 30, 2017, plaintiff was seen by Nurse Practitioner Munjanja Litell. He reported that his right elbow continued to drain and that he could not undergo a knee operation until the elbow resolved. He advised that his elbow had yet to heal and that he would like to have an unspecified procedure done but not at Bon Secours Hospital and not by Dr. Krishnaswamy. ECF 45-4 at p. 134. Plaintiff was advised that the authorization for the procedure would have to be cancelled and he signed a release of responsibility. *Id*. The following day, plaintiff's elbow dressing was changed. No drainage or swelling was noted. *Id*. at p. 136.

Dr. Nimely evaluated plaintiff on January 23, 2018, in order to develop a further treatment plan. ECF 47, ¶ 11. At that time, the wound was closed and no drainage was noted; however, plaintiff reported intermittent drainage. *Id*. Plaintiff was referred to the Wexford health wound care specialist for a telemedicine consultation (*id*.), which occurred on January 30, 2018. ECF 53-5.

In regard to the overall treatment of plaintiff's elbow injury, Nimely explains that subsequent to the March 2016 right elbow surgery, plaintiff developed a small open wound on the right elbow near the surgical scar that persistently continued to re-open and drain serosanguinous fluid and occasionally became infected. ECF 47 at ¶ 10. The cause of the wound is unknown, which Nimely opines is not uncommon given that medicine is not an exact science. *Id*. Nimely explains that the two primary possible diagnoses for plaintiff's condition were that 1) the tendon repair hardware installed provided a base for biofilm, which he describes

13

as a breeding ground for bacteria that are difficult to eradicate; or 2) the wound was related to an infected and inflamed sinus duct. *Id*. Plaintiff's surgeon considered it was likely that the hardware was the basis for the infection and recommended its removal along with debridement of the wound. *Id*. Given that plaintiff's wound continued unhealed after removal of the hardware, infection of the sinus duct has become the more likely cause of the open wound and is the focus of plaintiff's ongoing care. *Id*.

## II. Standard of Review

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th

14

Cir. 2002). Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In *Liberty Lobby*, the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

### III. Discussion

Plaintiff's claims regarding denial of medical care are governed by the Eighth Amendment of the United States Constitution, which prohibits "unnecessary and wanton

infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). To sustain a claim for denial of medical care under the Eighth Amendment, plaintiff must show that defendants' acts or omissions were done with deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Importantly, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). This is so because the Constitution "is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Id.* at 695-96.

The deliberate indifference standard regarding a serious medical need requires plaintiff to demonstrate that, objectively, he was suffering from a serious medical need and that, subjectively, the prison staff were aware of that need but failed to either provide treatment for plaintiff or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Plaintiff must also demonstrate that the Medical Defendants behaved with "subjective recklessness" in the face of his serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Put differently, if the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (noting court must focus on the precautionary actions actually undertaken in response to the risk, not the actions that could have been taken). For plaintiff to prevail, the treatment rendered "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

"Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier*, 896 F.2d at 851. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence or malpractice does not rise to the level of a constitutional violation. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble*, 429 U.S. 97, 106, (1976)). "The right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

The evidence viewed in the light most favorable to plaintiff establishes that he received constitutionally adequate medical care for his elbow injury including the wound that developed

after the surgery. Indeed, plaintiff attended regular medical appointments with qualified staff who provided ongoing attention to his injuries. He was provided examinations, diagnostic testing, including culturing of the infected area, repeated x-rays, and a CT scan, analgesic medication, antibiotic therapy both orally and intravenously, referral to specialists including surgical and wound care specialists, physical therapy, and he underwent two surgeries. His medications were regularly reviewed and adjusted in an effort to cure the infection and ease his discomfort.

When viewing the evidence as a whole and in the light most favorable to plaintiff, no evidence exists that plaintiff's treatment amounted to deliberate indifference. *See Estelle*, 429 U.S. at 105-06 (holding that an inadvertent failure to provide adequate medical care does not amount to deliberate indifference). Plaintiff has failed to demonstrate that any delays in the care he received were intentional. Moreover, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)). No exceptional circumstances exist here. The court does not discount plaintiff's pain and frustration with the length of time he suffered with an unhealed wound. However, the medical records coupled with the affidavits of Barrera and Nimely demonstrate sound reasons for the course of treatment, and they are unrebutted by plaintiff.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss or, in the alternative, for summary judgment will be GRANTED and judgment will be ENTERED in favor of defendants. A separate Order follows.

Dated this 6th day of August, 2018 .

                                                FOR THE COURT:

                                      _____/s/_____
                                      James K. Bredar
                                      Chief Judge